Filed 1/18/23

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br>RUBEN SILVA, JR.,<br><br>    Defendant and Appellant. | F083248<br><br>(Super. Ct. No. CRM005996A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County.  Ronald W. Hansen, Judge.  (Retired Judge of the Merced Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)

Solomon Wollack, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Ross K. Naughton, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with exception of the Factual Background and part III. of the Discussion.

## INTRODUCTION

Petitioner Ruben Silva, Jr., petitioned the superior court, pursuant to former section 1170.95 (now § 1172.6) of the Penal Code,[1] for resentencing on his conviction for second degree murder. The superior court held an evidentiary hearing (§ 1172.6, subd. (d)(1)) and denied the petition after finding petitioner was guilty of murder under an implied malice theory.

On appeal, petitioner argues the order denying the petition must be reversed because Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill No. 1437) eliminated implied malice as a valid theory of murder liability for aiders and abettors and, in any event, substantial evidence did not support a finding petitioner acted with implied malice. We affirm.

## FACTUAL BACKGROUND[*]

Briefly stated, Bill James was fatally stabbed on November 6, 2009, during an altercation with members of the Mongols motorcycle club, including petitioner. The following evidence was adduced at petitioner's trial.[2]

### I. The Mongols

Extensive testimony was presented at trial regarding the Mongols, their organizational structure, and their criminal activities.

Montebello Police Sergeant C. Cervantes testified as an expert on the Mongols. Cervantes was assigned to a federal Bureau of Alcohol, Tobacco, Firearms and

---

[1] Undesignated statutory references are to the Penal Code. Former section 1170.95 recently was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) We will refer to the current section 1172.6 in this opinion.

[*] See footnote, *ante*, page 1.

[2] Our factual summary is derived from the reporter's transcript from petitioner's direct appeal (F064330). The clerk's and reporter's transcripts from petitioner's direct appeal were lodged in the superior court and subsequently filed in this court as part of the record on appeal. We additionally took judicial notice of the record on appeal in case No. F064330.

Explosives (ATF) task force in Los Angeles called the "One-Percenter Task Force," which investigates outlaw motorcycle gangs. Cervantes explained, "The term one-percenter was defined by the American Motorcycle Association years back and in defining the term they suggested that 99 percent of American motorcyclist[s] are law abiding," while "[t]he other one percent are outlaws." He identified the Mongols as a "one-percenter gang."

Beginning in 2005, Cervantes was a case agent for an approximately four-year-long investigation called "*Operation Black Rain*," which involved infiltration of the Mongol gang by undercover agents. The infiltration involved three undercover ATF agents in a Mongol chapter in Los Angeles and one undercover ATF agent in a Mongol chapter in Las Vegas, all of whom became "full Mongol members." During this time, the Mongols had four to five hundred members. However, at the time of trial, Cervantes estimated there were probably 250 to 300 Mongol members.

Cervantes explained there are two ways to join the Mongols, the first and most respected of which is to "prospect in." A person begins this process by "hang[ing] around loosely at parties and some other events," then gaining "100 percent approval" to come into a particular chapter. Upon gaining such approval, the individual is given a "bottom rocker," which is "the most important identifier . . . as it identifies the state name." The bottom rocker is placed on a black riding vest, and a tab that says "prospect" is placed on the front of the vest to identify the individual as prospecting. During this phase, prospects may be given simple tasks, such as running errands, or may carry drugs or guns. However, the "most important job" for a prospect is to provide security at Mongol events, parties, or meetings. After a period of time, a prospect will be given a center patch bearing a caricature of Genghis Khan on a motorcycle, "which is the Mongol emperor." During this period, the individual may be tasked with similar duties as during the initial prospecting phase. Eventually, when the individual becomes a full member, they receive the "top rocker," which is the "most important one" and bears the name

3.

"Mongols." Becoming a full member also requires a "100 percent vote."[3] All the undercover ATF agents involved in Operation Black Rain "prospected in."

Cervantes explained that the Mongols are configured by chapters, all of which are governed by the "Mother Chapter" in Southern California, which is governed by the national president. If individual chapters have issues they cannot work out amongst themselves, those issues are taken to the national chapter. The Mongols have a constitution, which does not "elude to criminal activity." However, a prior, 2002 edition of the constitution did include criminal protocols and, according to Cervantes, an attorney for the Mongols had that material removed. The Mongols also have a fight song, which is recited at a variety of events and gatherings, as follows:

> "We're Mongol raiders, we're raiders of the night. We're dirty sons of bitches. We rather fuck and fight. [¶] . . . [¶] We castrate our enemies with a dirty piece of glass and shove our rusty buck knives up their fucking ass. [¶] . . . [¶] Hidy hidy christ almighty who the fuck are we. Shit, fuck, cunt, suck, Mongols MC."

Cervantes also described a document called "Simple Protocol," which describes how Mongols "would like to see themselves behave." One part of the document states, "Always pay attention and be alert. Carry yourself as though you are at war." Cervantes explained that the Mongols have rivals, the "most bitter and probably bloody" being the Hells Angels. Cervantes explained this rivalry had continued for "many years" and "many members on both sides have died" in violent confrontations in Northern and Southern California. Another part of the protocol provides: "If you get arrested never give a statement of any kind. Don't make the stupid mistake of lying to talk your way out of jail. All you'll end up doing is telling on yourself or implicating Brothers or

---

[3] The second way to join the Mongols is "probating in." In this process, a probate member receives all three patches at once, as well as a "diamond 'P' " for the front of the vest. The individual remains on probation for a year. This process is allowed when there is a need to increase membership numbers quickly.

someone else. Remember telling on yourself is telling on a Brother. Always say that you have nothing to say and you want to speak with an attorney." The protocol also advised members not to "say anything adverse that would cause anyone to go to jail, even if it's not a Brother."

Another part of the simple protocol states, "[R]emember everything you do reflects on the club. Never make the club look bad." Cervantes explained that, if a member gets disrespected and does not act or respond, it reflects poorly on the group. Failure or refusal to act could result in being kicked out or other ramifications. Cervantes explained that there have been "several instances" of Mongols "[getting] into it" at bars with people who are not affiliated with a rival gang.

Cervantes testified that the Mongols associate with the colors black and white, whereas the Hells Angels associate with red and white. Cervantes explained that both Mongols and Hells Angels claim the territory in Central California, but the Hells Angels are the dominant presence. Cervantes explained that the Mongols engage in criminal activities, including theft of motorcycle parts and motorcycles, drug sales, firearms proliferation, witness intimidation, violent assaults, and murder. However, the Hells Angels are "more business oriented" and less violent than the Mongols. Undercover ATF officers were indoctrinated that they were at war and were to be alert and on guard for issues with the Mexican Mafia and the Hells Angels. He explained the Hells Angels "were to be dealt with onsite and that included murder."

Cervantes testified it is common for Mongols to have large parties, which involve a standard protocol. Cervantes described these parties as "self[-]regulated," with the Mongols providing their own security. When coming in to "enemy territory," they may stay "right where they're at," and may send security out beforehand to make sure the area can be secured. Undercover ATF agents were trained that, in Northern California, they required a heightened sense of security because the area is dominated by Hells Angels. The undercover agents were indoctrinated in how to secure locations and to immediately

5.

check any public facility they walked into. Additionally, for some parties and gatherings, the Mongols will institute a curfew, which is strictly enforced. Cervantes explained that law enforcement generally has very few problems with these types of events because "they take care of themselves and they're with each other." However, when small groups leave the party and go out in public or to bars, "the problems erupt." These problems can include fights, stabbings, shootings, and assaults.

Cervantes explained that a "rat pack" describes when a person is jumped, beat up, or hit repeatedly by multiple people. He explained this is a common Mongol occurrence and Mongols are trained in this activity. Additionally, when any Mongol is involved in a fight, others are told to jump in to protect their members. Weapons would be used, even if the victim did not have a weapon. Cervantes explained that rat packs occurred at least monthly, if not daily. Rat packs are also mentioned in the "Simple Protocol."

Cervantes explained that Mongols are required to carry knives. However, some bars and other locations check for weapons at the door, and Mongols may not be armed in such situations. Language requiring Mongols to carry knives was contained in the original Mongols constitution but was removed.

## II. The Stabbing

### A. Overview

During the weekend of November 6, 2009, the Mongols held an event at a hotel in Santa Nella. The Mongols had imposed a curfew on their members during the event.

Shortly after 11:00 p.m., a group of seven to eight men briefly entered the Pastime Club in Gustine. Based on surveillance video of the Pastime Club, Cervantes identified the group as including petitioner, Andrew Silva, Albert Aleman, Richard Naudin, Brandon Carvalho, Rafael Valdez, and twin brothers, Mark and Anthony Oseguera. All but Andrew Silva were Mongol members from various California chapters. Andrew Silva was a member of a "wrecking crew," which Cervantes described as a group of younger relatives of Mongol members who sometimes are recruited into the gang. Inside

the Pastime Club, the men divided into groups and searched the premises, including the bathroom. The group left without speaking to anyone.

Soon thereafter, a group of men entered the Gustine Club, approximately one block down the street from the Pastime Club, where James was a patron. Several men approached James and shouted something to the effect of "Mongols[,] motherfucker." James attempted to remove his jacket and said, "I don't give a fuck who you are." Some of the bar patrons heard what sounded like a switchblade or retractable knife being opened. The men immediately attacked James, with at least one of the men making thrusting motions at him. James was seemingly stabbed with a knife during this encounter. Another man sprayed the area with pepper spray.

The fight moved outside. James fought someone through the rear passenger door of a truck in the parking lot. Another man approached James from behind and stabbed him twice in the back. James fell to the ground and later died.

James died from multiple stab wounds. He suffered "seven sharp force injuries" including (1) a three-inch long, six-inch deep wound to the left side of the neck, which extended down the back, through the skin, and into the muscle; (2) a 1-7/8-inch long, nine-inch deep wound to the right flank that entered the right chest, nearly cut the liver in half, passed through the right diaphragm and right lung, and nicked the superior vena cava, a large vessel around the heart; (3) a 7/8-inch long, four-inch deep wound to the left chest that passed through the left lower lobe of the lung; (4) a 1-1/2-inch long, four-inch deep wound to the upper midback that penetrated the left chest and lung and incised the sack around the heart; (5) a 1-1/2-inch long, nine-inch deep wound to the lower mid-back, which entered the abdominal cavity and incised multiple loops of small bowel;[4]

---

[4] The foregoing wounds were described variously as "a 16-inch wide," "1/16 inch wide," and "16-inch wide." The pathologist explained that the width measurement is taken by "push[ing] the edges back together, which is the best way to do the

(6) a 3-1/2-inch long, 1/2-inch wide, and one-inch deep incised wound to the back of the right arm; and (7) a 5-1/2-inch long by 1-1/2-inch wide incised wound to the front side of the right forearm.

## B. Eyewitness Accounts

Sara G. was seated at the bar of the Gustine Club with her roommate, Ashley K.[5] Ashely was seated next to James.[6] Sara saw a group of four to six men suddenly approach James shouting, "Mongols motherfucker, what's up." She described one of the men as a "short and kind of chunky" (capitalization omitted) Hispanic man with a black goatee, approximately five feet, four inches or five feet, five inches tall and approximately 220 pounds. Sara heard what sounded like a "retractable knife" or switchblade being flipped out and saw the man make a motion with his left hand like he was flipping out a knife. She did not see the knife itself. She identified this man as petitioner. At the same time, a tall, skinny man deployed what Sara thought was a can of mace. Sara ran outside, where she saw the men flee in two or three vehicles, including a black or gray pickup truck, which petitioner entered.

---

measurements." It therefore appears the references to a 16-inch wide wound may be a transcription error.

[5] Pursuant to California Rules of Court, rule 8.90, we refer to some persons by their first names. No disrespect is intended.

[6] At the time of trial, Sara no longer had a good memory of the incident. She testified primarily regarding statements she previously made to law enforcement. She first was interviewed on November 6, 2009, the night of the incident. She testified that, at that time, the incident was fresh in her mind and her statement was truthful.

On November 9, 2009, she provided a written statement to a different officer. Sara acknowledged she had spoken to two other people between her interview and her written statement, and she included in her statement information she heard from other people and did not personally witness. She did so because she believed the police wanted all the information she had. We include in our summary only those facts Sara stated she witnessed herself.

Ashley was sitting between James and Sara when a group of 12 to 15 men wearing black and white entered the bar and divided up. Approximately five of the men walked toward Ashley's area while the others remained near the door. As the group walked past her, she heard someone say "Mongols." She later identified petitioner as part of this group based on his distinctive "bow tie" goatee. She told Sara to put her beer down so they could leave. She heard the clicking sound of a knife. When she turned around, the bar was sprayed with mace. She was severely affected by the mace and unable to see anything else.

Denise G. was standing next to James when a group of approximately six to seven men entered the bar and walked directly toward James. Denise and James had recently reentered the bar after going out back to smoke. Denise described the group of men as acting "really tough like, like they were on a mission." Three of the men came up behind Denise and said some words toward James. Denise could not make out the words other than "mother" and "Mongols." James said, "What?" and the men repeated themselves. James said, "I don't give a shit" and two of the men lunged for him. Denise thought petitioner was one of the men who lunged at James but was not certain. Denise was pushed out of the way and another man pepper sprayed the bar using an approximately 15-inch canister. Denise ran outside and saw people running around. She saw James collapse and reached down to touch him. Her hands came up full of blood so she retrieved towels from the bar to try to stop the bleeding. She saw a light silver pickup truck pulling away with a partially opened passenger door. She did not see the stabbing.

Jennifer H. was working as a bartender at the Gustine Club and recalled James had a calm demeanor that evening. At approximately 11:15 p.m., six or seven men who looked like gang members walked in, and the other patrons became quiet and appeared uncomfortable. The men proceeded directly toward James and said something Jennifer could not hear. James replied, "What?" James tried to take off his jacket and, as his jacket was halfway off, all the men except for one jumped him. The other man pepper

9.

sprayed the area using a 14- to 16-inch canister. Jennifer initially ducked behind the bar and eventually ran outside where she saw the men jumping into a white Chevy Tahoe and a gray GMC pickup truck. James was lying on the sidewalk bleeding from his mouth and arm.

Amaro M. was also at the Gustine Club when approximately six men walked in and said, "Mongols, motherfucker, Mongols, Mongols. What's up? Mongols." Three of the men walked past Amaro and around James and one of them said something to James under his breath. Three more men approached and surrounded James. James said, "I don't give a fuck who you are." Amaro heard what sounded like the flick of a knife, and one of the men made a motion with his left hand. The men then rushed James and the man who had what sounded like a knife began thrusting at James with his right hand. Amaro grabbed the man from behind and pulled him off and another man pulled out what looked like a 14- to 16-inch fire extinguisher and sprayed the area. Amaro ran for the door. Outside, he saw James standing in the open rear passenger doorway of a white Ford F150 extended cab truck. James appeared to be fighting with someone in the backseat when someone in a white T-shirt with a Mongols insignia ran up and stabbed him twice in the back with a 10- or 12-inch knife. The vehicles took off and James fell to the ground. Amaro saw that James had a hole in his neck and his arm was split open from his bicep to his forearm.

### III. Law Enforcement Response

Gustine Police Officer T. Warner responded to the Gustine Club at approximately 11:30 p.m. and observed people in the area who were coughing and had red, watery eyes consistent with being pepper sprayed. The air also smelled of pepper spray. Warner found James lying facedown, partially in the roadway and partially on the sidewalk in front of the Gustine Club. James was covered in blood and, when Warner flipped him over, Warner observed a large, eight-inch laceration to James's right arm at the bend of

10.

his elbow. He also observed a large stab wound to the middle, lower portion of James's back on the right side.

Meanwhile, Merced County Sheriff's Deputy R. Daniel was on patrol at approximately 11:30 p.m. when he responded to radio traffic by traveling toward Santa Nella, on the lookout for a white Chevy Tahoe heading southbound on Highway 33. As he came over an overpass, he spotted a white Chevy Tahoe traveling southbound on Highway 33, followed "very closely" by a silver pickup. Both the Tahoe and the pickup entered the parking lot for the hotel where the Mongol event was occurring. Once in the parking lot, the vehicles drove in different directions. Daniels stopped to deploy his patrol rifle before following the Tahoe. Daniels drove around the north side of the hotel and observed four to five men exiting the Tahoe and moving around it before eventually going into the hotel. Daniels backed into a corner of the parking lot where he could keep an eye on the Tahoe. A group of approximately 10 men came out of the hotel and stood in a breezeway adjacent to the Tahoe. A female also came out of the hotel, opened the Tahoe, removed items, and returned to the hotel. She made three trips to the Tahoe. Eventually, more patrol units arrived and established a perimeter.

In the hotel parking lot, law enforcement located the gray or silver GMC pickup truck and white Chevy or GMC Tahoe and had them towed. Both vehicles were processed for fingerprints. Petitioner's fingerprint was found on a snack package inside the pickup truck. Aleman's fingerprints were found on the exterior front passenger door of the Tahoe. Naudin's fingerprints were found on a water bottle inside the Tahoe. Dark red stains were visible in the front and rear passenger side cab, interior door panel, door handle, front passenger dashboard, and exterior passenger side of the pickup. In the Tahoe, officers observed "blood spatter in the front passenger side area, the rear backseat and a third row seat." These included red-brown stains in the upper right-hand corner of the center console, the rear passenger side door, the rear center console armrest, the rear back seat on the driver's side, and the third-row seatbelt buckle.

11.

Approximately three to five feet in front of the Tahoe, law enforcement located a black beanie with a red stain, as well as a black sheath, approximately 16 inches long, bearing the word "Mongols." In a different part of the parking lot law enforcement located another black beanie. The following day, a hotel employee located a white shirt next to a large knife underneath a stairway, as well as several shirts in a trash can. One of the shirts in the trash can was black, white, and gray plaid; an additional shirt or shirts were white. The shirt next to the knife was long sleeved and had red stains around the cuff. The parties stipulated that the plaid shirt and the long-sleeved shirt emitted a strong odor of pepper spray.[7]

Inside the Gustine Club, near where James had been attacked, authorities recovered a blue and white plaid jacket with a "bloodstain right below the jacket." Denise identified the jacket as belonging to James. In the street, police found a cell phone, several white towels (one of which had "blood all over it"), a black Raider's ball cap, and two black T- shirts. Police found a red plaid button-down shirt on the sidewalk in front of the bar, a black ball cap on a chair just outside the door of the bar, and a cellophane cigarette wrapper on the sidewalk just south of the front door to the bar. The day after the incident, a passerby found a "black handle folding knife" in the street on the same block as the Gustine Club.

DNA testing of blood from both knives and both vehicles excluded petitioner as a major contributor to any of the samples. A sample from the blade of the knife found under the stairwell contained a mixture of DNA from two contributors, the Oseguera brothers and James.[8] A trace DNA swab of the same knife also contained a mixture of two contributors, with the major profile matching the Osegueras. James could not be

---

[7] The other shirts were not examined by the trial attorneys or the jury due to risk of exposure to the effects of pepper spray.

[8] Because the Osegueras are identical twins, it was impossible to distinguish between their DNA samples.

excluded as a minor contributor to this mixture. A sample from an apparent blood stain on the handle of the black folding knife contained a mixture of two contributors, with James as the major contributor. There was insufficient information to determine the source of the minor contributor. A trace DNA swab of the same knife contained a mixture of three contributors, with Valdez as a possible major contributor. Blood stains from inside the pickup truck and Tahoe matched James's DNA profile. Blood stains on the Tahoe's passenger side upper center console, rear center console and driver's side rear bench seat matched the Oseguera DNA profile. Petitioner's DNA was found on a size 4X white T-shirt recovered from the hotel garbage.

## IV.     Eyewitness Identification

Police showed photographic lineups of the suspects to Sara, Ashley, Denise, and Amaro.

Sara identified petitioner as the short, "chunky" assailant with the black goatee who she reported to law enforcement on the night of the murder.[9] At the time of the preliminary hearing and trial, Sara was no longer able to identify petitioner.

Ashley identified petitioner in a photographic lineup as the man with the "bow tie" goatee.

Denise identified petitioner, Naudin, one of the Oseguera twins, and petitioner's relative, David Silva, from four photographic lineups.[10] Denise identified petitioner at the preliminary hearing as one of two assailants who lunged at James.

Amaro identified petitioner as one of the assailants. He recognized petitioner because "he was one of the scariest looking guys that came in the bar that night." Amaro

---

[9] Although the testimony in this regard is somewhat difficult to decipher, the parties agree that Sara, Ashley, Denise, and Amaro identified petitioner as a participant in the attack.

[10] However, the parties stipulated that David Silva was not at the Pastime Club or the Gustine Club on the night of the incident.

13.

explained that petitioner rushed James, went "over the top" of another of the perpetrators, and came "down" on James. Amaro initially identified Mark Oseguera as the man who stabbed James, both inside and outside the bar. However, several days later, he contacted police to say he made a mistake. He then identified Mark Oseguera as the stabber inside the bar, and petitioner as the stabber outside the bar. At trial, he maintained that petitioner stabbed James outside the bar.

Police showed the Pastime Club video to Sara, Ashley, and Amaro before showing them the photographic lineups. Sara testified that her identification of petitioner in the photographic lineup was based on her observation of him on the night of the murder and not her review of the Pastime Club video. Ashley identified Carvalho from the Pastime Club video as the man with the pepper spray.

## V.    Petitioner's Interactions with Law Enforcement

On November 7, 2009, Gustine Police Sergeant J. Hamera was working at the Gustine Police Department when petitioner came in to try to get the pickup truck released from impound. The pickup was registered to a different individual from Southern California.

Hamera conducted a recorded interview with petitioner, which was played for the jury. Hamera informed petitioner that the vehicle had been seized as evidence in a homicide and, in any event, could only have been returned to the registered owner. Petitioner explained he was from Whittier and had borrowed the pickup from his friend's father for the weekend. He stated he was staying at the hotel but not in any particular room and had no affiliation or friendship with the Mongols. Petitioner confirmed he still had the keys to the pickup. He explained that, after arriving in town, he went to a bar in Gustine by himself, but could not recall which one. He walked in, saw a commotion and mace being sprayed, and ran out. He got in the truck and started to reverse when another man jumped at the vehicle and tried to lunge through the passenger window. Petitioner "threw it in reverse and took off." (Capitalization omitted.) He denied seeing anyone get

14.

stabbed. When he got back to the hotel there was "blood everywhere" on the door of the pickup and he cleaned it with a rag. (Capitalization omitted.)

## VI. Expert Opinion

Cervantes opined that the men who visited the Pastime Club, including petitioner, were a "war party" and were searching the bar to identify problems or rivals, including "potential Hells Angels." Cervantes opined that "[e]very guy who left that [secured] hotel . . . kn[ew] what kind of trouble [wa]s looming out there." Cervantes further opined, "They obviously don't see anything in there that sparks their interest as far as Hells Angels or disrespect and away they go." Cervantes explained: "I mean, again, I use the term war party. This is very clear that they're on a hunt, they're on a mission. They're in Northern California. They definitely entered this bar looking for issues and apparently they didn't find it in this bar so they went to the next one."

Cervantes explained the undercover ATF agents were trained that "the level of awareness and your heightened sense of security doubles in Northern California because of the fact it's dominated by Hells Angels. And there is just definitely no better way to make your mark than obviously to assault or kill Hells Angel[s]." Cervantes continued: "Now, the other thing is that when they go into different parts of the country or different regions they will make a stand and let other clubs and other people know they're there. [¶] So this is definitely not uncommon. They will come in to the bars or to the areas and regions and get it out to the locals, hey, the Mongols were here. It goes back to the Hells Angels and Vagos or other clubs that they came into, rode through your club, went into your bars, made a stand, walked through wearing their stuff and they left. [¶] So this is a sign of their unity and their ability to sort of put it back in rival's faces. This is not uncommon activity that we saw for a number of years during our investigations."

Upon being presented with a hypothetical question matching the facts of the instant case, Cervantes opined that the crime was committed "for the benefit of, direction of or [in] association with a criminal street gang." Cervantes opined that there was

15.

something in the bar that prompted one or more of the group to come into the bar and yell out their gang name. Cervantes further opined that James's reaction—"I don't give a shit or I don't give a fuck who you are"—would have been perceived as disrespect and ultimately was his "demise." Cervantes explained that James could have been mistaken for another biker and his appearance was "what we come to expect Hells Angels to look like. Male, white, shaved head, large bushy goatee-type panhandled mustaches, tattoos." Although James's tattoos were covered, Cervantes opined that "in a bar, Northern California and if you're from Los Angeles and you're a Hispanic Mong[o]l that walks into one of these bars that right there could easily be mistaken as a Hells Angel." Cervantes additionally noted that James was wearing red underwear that may have been visible. "So you have red underwear, male, white, bald large bushy goatee type mustache, sort of that tough look in Northern California bar. 100 percent could be mistaken any day of the week for a Hells Angel." Regardless, Cervantes opined, "disrespect was part of it and it ultimately ended up costing Mr. Bill James's life."

## VII. Defense Case

Jennifer H. testified that, prior to working at the Gustine Club, she was employed at a nearby bar and grill, which the Hells Angels sometimes frequented. Laura B. was the manager of the Gustine Club and testified the Hells Angels did not frequent that bar. Gary M. was at the Gustine Club on the night of the incident, seated near the front door, and did not recall hearing anyone yell "Mongols."

The parties stipulated that Ashley identified David Silva in a photographic lineup as being in the Gustine Club on the night of the incident. The parties further stipulated that David Silva was not in the Gustine Club on the night of the incident but instead was at the hotel in Santa Nella, "working security."

Officer Warner interviewed Amaro on November 6, 2009, and Amaro stated James had not been targeted. Amaro also stated he had been confronted by one of the Mongols who "got directly into his face." A detective interviewed Amaro the following

16.

day, and Amaro reported that James turned around quickly once the Mongols entered the bar. Amaro thought someone may have bumped into James, but he was not sure.

Detective M. Ruiz showed the Pastime Club video to Sara before she had seen a lineup because, at that time, authorities did not know the identity of any of the suspects and could not put a photographic lineup together. Another detective showed Denise the video of the Pastime Club before showing her photographic lineups.

Pictures were taken of petitioner on November 7, 2009, at the Gustine Police Department. At that time, Detective L. Clark did not see any obvious signs that petitioner had been in a fight. On November 22, 2009, petitioner weighed 306 pounds and was five foot eight inches tall.

Dr. J. Hernandez, a criminal justice professor at California State University, Sacramento, testified for the defense as a gang expert. Hernandez disagreed with Cervantes's assessment that the Mongols "storm[ed]" the Pastime Club. Instead, he saw only "[a] bunch of guys walking into a bar." He was aware of the event at the hotel in Santa Nella, and stated the Mongols have a lot of rules and "very often it's easier just to leave the event . . . than put up with the rules at a Mongol event." He did not believe the group of Mongols left the hotel looking for trouble. Nothing about James's dress would cause him to be identified as a Hells Angel. He rejected Cervantes's characterization of the group as a "war party." He stated that, after Operation Black Rain, there was an effort to minimize the conflict between the Mongols and the Hells Angels and the Mongols became less confrontational. He testified that not all Mongols will join in an altercation with a fellow member and instead may intervene to stop the altercation.

Dr. R. Shomer, an experimental psychologist, testified that eyewitness identification has a low level of reliability for multiple reasons. He opined it was "unfortunately suggestive" for officers to show witnesses a video of possible suspects before conducting a photographic lineup.

17.

## PROCEDURAL HISTORY

### I.     Underlying Conviction

Petitioner was charged with murder (§ 187, subd. (a); count 1) and active participation in a street gang (§ 186.22, subd. (a); count 2).  As to count 1, the information alleged a gang enhancement (§ 186.22, subd. (b)) and an enhancement for personal use of a knife (§ 12022, subd. (b)(1)).  During the settling of jury instructions during trial, the prosecutor conceded the evidence was insufficient to support a charge of first degree murder, and that only second degree murder could be charged.  Additionally, on motion by the People, the court struck the knife use enhancement.

The jury convicted petitioner of second degree murder with a gang enhancement, and active participation in a street gang.  Petitioner was sentenced on count 1 to a term of 15 years to life, and on count 2 to a consecutive two-year term.  On appeal, we ordered the sentence on count 2 stayed pursuant to section 654, but otherwise affirmed.  (*People v. Silva* (Jan. 31, 2014, F064330) [nonpub. opn.].)

### II.    The Petition for Resentencing

On January 4, 2019, petitioner filed a petition for writ of habeas corpus, seeking resentencing on his murder conviction pursuant to section 1172.6.  Although the court initially appointed counsel to represent petitioner, petitioner subsequently retained counsel to represent him on the petition.  The People opposed the petition on the grounds Senate Bill No. 1437 was unconstitutional and, in any event, petitioner was ineligible for resentencing as "a direct perpetrator" of the murder or an aider and abettor who acted with malice.  In support, the People submitted the record on appeal and this court's opinion from petitioner's direct appeal, as well as the probation report from his initial sentencing.  After further briefing, the superior court determined petitioner had made a prima facie showing of resentencing eligibility and was entitled to an evidentiary hearing.

Prior to the hearing, the superior court filed a tentative statement of decision. Petitioner filed a response to the statement of decision.  The matter was heard on July 30,

18.

2021.  The court denied the petition on the record and also issued a statement of decision explaining its reasoning.  The court found the trial evidence failed to prove, beyond a reasonable doubt, that petitioner was the actual killer or acted with express malice.  However, the court found the evidence proved beyond a reasonable doubt that petitioner was guilty of murder as an aider and abettor who acted with implied malice.[11]  Accordingly, the court determined petitioner was not entitled to resentencing.

## DISCUSSION

### I.    Applicable Law

Effective January 1, 2019, the Legislature passed Senate Bill No. 1437 "to amend the felony murder rule and the natural and probable consequences doctrine . . . to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life."  (Stats. 2018, ch. 1015, § 1, subd. (f); accord, *People v. Strong* (2022) 13 Cal.5th 698, 707-708 (*Strong*).)  The bill amended the natural and probable consequences doctrine by requiring that a principal act with malice aforethought before he or she may be convicted of murder.  (§ 188, subd. (a)(3); accord, *People v. Gentile* (2020) 10 Cal.5th 830, 842-843 (*Gentile*).)  The bill amended the felony-murder rule by providing that a participant in a qualifying felony is liable for murder only if the victim was a peace officer in the performance of his or her duties, or

_____

[11] The court also found the evidence established petitioner was a major participant in the attack and acted with reckless indifference to human life, standards that would be applicable under a felony murder, rather than implied malice, theory.  The court also determined the evidence proved, beyond a reasonable doubt, that petitioner aided and abetted in the crime of assault with a deadly weapon and that he did so for the benefit of or in association with a criminal street gang.  The court likewise determined the evidence proved, beyond a reasonable doubt, that petitioner was an active member of a criminal street gang as alleged in count 2.  It is unclear why the court made findings on these matters, which were not at issue in the section 1172.6 proceedings.  However, as petitioner concedes, the court's ultimate ruling was based on its determination that petitioner acted with implied malice.

19.

the defendant was the actual killer, aided and abetted the actual killer in the commission of first degree murder with the intent to kill, or was a major participant in the felony and acted with reckless indifference to human life. (§ 189, subds. (e), (f); accord, *Strong*, at p. 708.)

Senate Bill No. 1437 also added former section 1170.95, now renumbered as section 1172.6, which provides a procedure for persons convicted of "felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime" to seek vacatur of the conviction and resentencing. (§ 1172.6, subd. (a); accord, *Gentile*, *supra*, 10 Cal.5th at p. 853.) Under section 1172.6, an offender seeking resentencing must first file a petition in the sentencing court, and the sentencing court must determine whether the petitioner has made a prima facie showing that he or she is entitled to relief. (§ 1172.6, subds. (a)-(c); accord, *Strong*, *supra*, 13 Cal.5th at p. 708.) If the trial court determines the petitioner has made such a showing, "the trial court must issue an order to show cause and hold a hearing to determine whether to vacate the murder conviction and to resentence the petitioner on any remaining counts." (*Gentile*, *supra*, 10 Cal.5th at p. 853; accord, § 1172.6, subds. (c), (d)(1).)

At this evidentiary hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . under California law as amended by the changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (d)(3).) Significantly, "[a] finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Ibid*.) The prosecutor and the petitioner may offer new or additional evidence to meet their respective burdens. The admission of evidence at the hearing is governed by the Evidence Code. However, the court also "may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness

20.

testimony, stipulated evidence, and matters judicially noticed," as well as the "procedural history of the case recited in any prior appellate opinion." (§ 1172.6, subd. (d)(3).)

We review the trial court's findings following the evidentiary hearing for substantial evidence, and the application of those facts to the statute de novo. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 412.)

## II.    An Aider and Abettor to Murder Need Not Act with Express Malice

Petitioner argues Senate Bill No. 1437 eliminated implied malice as a valid theory of murder for aiders and abettors. He therefore argues an aider and abettor to murder must act with express malice. We adopt the reasoning of every court to have addressed this issue and conclude that implied malice remains a valid theory of liability for aiders and abettors to murder. (E.g., *People v. Vargas* (2022) 84 Cal.App.5th 943, 953-955 (*Vargas*); *People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388-392 (*Vizcarra*); *People v. Langi* (2022) 73 Cal.App.5th 972, 982-983 (*Langi*); *People v. Powell* (2021) 63 Cal.App.5th 689, 710-714 (*Powell*).)

"Murder, whether in the first or second degree, requires malice aforethought." (*Gentile*, *supra*, 10 Cal.5th at p. 844.) "Malice can be express or implied. It is express when there is a manifest intent to kill (§ 188, subd. (a)(1)); it is implied if someone kills with 'no considerable provocation . . . or when the circumstances attending the killing show an abandoned and malignant heart' (§ 188, subd. (a)(2))." (*Ibid.*) More specifically, "second degree murder based on implied malice has been committed when a person does ' " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life' ". . . .' [Citation.] Phrased in a different way, malice may be implied when defendant does an act with a high probability that it will result in death and does it with a base antisocial motive and with a wanton disregard for human life." (*People v. Watson* (1981) 30 Cal.3d 290, 300.)

21.

"When a person directly perpetrates a killing, it is the perpetrator who must possess . . . malice. [Citations.] Similarly, when a person directly aids and abets a murder, the aider and abettor must possess malice aforethought." (*Gentile*, *supra*, 10 Cal.5th at p. 844.) "Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime." (*Id*. at p. 843.) Thus, "[g]uilt as an aider and abettor is guilt 'based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' " (*Powell*, *supra*, 63 Cal.App.5th at p. 710.)

As our sister court has explained, "[i]n the context of implied malice, the actus reus required of the perpetrator is the commission of a life-endangering act. For the direct aider and abettor, the actus reus includes whatever acts constitute aiding the commission of the life[-]endangering act. Thus, to be liable for an implied malice murder, the direct aider and abettor must, by words or conduct, aid the commission of the life-endangering act, not the result of that act. The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit the act, intent to aid the perpetrator in the commission of the act, knowledge that the act is dangerous to human life, and acting in conscious disregard for human life." (*Powell*, *supra*, 63 Cal.App.5th at p. 713, italics & fns. omitted; accord, *Vargas*, *supra*, 84 Cal.App.5th at p. 954.)

Petitioner argues that, in eliminating the natural and probable consequences doctrine, Senate Bill No. 1437 eliminated aider and abettor liability for "unintended" murders and made the crime of aiding and abetting murder "structurally identical" to crimes like attempted murder and conspiracy to commit murder, which both require specific intent to kill. However, our high court has continued to recognize "[t]hat one may intentionally aid a perpetrator in doing an act when he or she knows the act naturally and probably will cause death and consciously disregards this probable result." (*Powell*, *supra*, 63 Cal.App.5th at p. 713, citing *Gentile*, *supra*, 10 Cal.5th 830.) In *Gentile*, the high court explained that a direct aiding and abetting theory of murder "requires that 'the

22.

aider and abettor . . . know and share the murderous intent of the actual perpetrator.' [Citation.] For implied malice, the intent requirement is satisfied by proof that the actual perpetrator ' "knows that his conduct endangers the life of another and . . . acts with conscious disregard for life." ' [Citation.] Therefore, notwithstanding Senate Bill [No.] 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Gentile*, at p. 850.) We agree with *Powell* that "[t]his language clearly suggests an aider and abettor can be liable for implied malice murder as a theory independent of the natural and probable consequences doctrine." (*Powell*, at p. 713.)

Accordingly, we reject petitioner's contention that an aider and abettor to murder must act with express malice.

## III. Substantial Evidence Supports Denial of the Petition*

Petitioner argues the superior court's finding that he acted with implied malice is not supported by substantial evidence. We disagree.

Petitioner does not dispute that the evidence supports a finding that he participated in the attack. Indeed, multiple eyewitnesses identified petitioner as one of the attackers who initiated the altercation within the bar. However, petitioner contends there is no basis in the evidence to conclude he knew his companions were armed or intended to stab James. We conclude substantial evidence supports a finding that petitioner knew the perpetrators of the murder intended to commit a life-endangering act, petitioner intended to aid them in the commission of that act, he knew the act was dangerous to life, and he disregarded that risk. (*Powell*, *supra*, 63 Cal.App.5th at p. 713.)

---

* See footnote, *ante*, page 1.

23.

First, substantial evidence supports an inference that petitioner knew his companions were armed and intended to engage in a planned, coordinated attack. Cervantes characterized the Mongols who entered the Pastime Club as a "war party," who left when they did not see anything that sparked their interests. The group was armed with at least two knives, one of which was described as a large hunting-type knife. One member of the group also carried an approximately 16-inch can of pepper spray. The group quickly entered the Gustine Club yelling the name of their gang and proceeded directly to confronting James. After the Mongols provoked a response from James, the encounter proceeded rapidly to life-endangering violence. At least one witness testified that one of the perpetrators made thrusting motions toward James, and the superior court found that James was first stabbed during the assault inside the bar. Substantial evidence supports a finding that petitioner intended to aid in this life-endangering act.

Additionally, Cervantes testified that Mongols are required to carry knives. Although he testified that this and other requirements were eventually removed from the Mongol constitution, he explained that this was done on the advice of a lawyer to make the constitution less incriminating. Moreover, multiple eyewitnesses testified to hearing the sound of a knife being flipped open at the onset of the attack. Given the testimony regarding the attackers' proximity to other patrons, a trier of fact reasonably could infer that petitioner also heard the sound of a knife being flipped open and therefore knew, by the time he joined the attack, that life-endangering violence would be used. In joining the melee, he disregarded this risk to life.

Accordingly, substantial evidence supports the superior court's finding that petitioner acted with implied malice.

**DISPOSITION**

The order is affirmed.

DETJEN, J.

WE CONCUR:


POOCHIGIAN, Acting P. J.


PEÑA, J.